**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BARBARA WALSH, for her minor child, A.W.,** | ) ) ) | |
| **Plaintiff,** | ) ) | **No. 15 C 10158** |
| **v.** | ) ) | **Magistrate Judge Jeffrey Cole** |
| **CAROLYN W. COLVIN, Commissioner of Social Security,** | ) ) ) | |
| **Defendant.** | ) ) | |

## MEMORANDUM OPINION AND ORDER

Barbara Walsh seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her daughter A.W.'s application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). 42 U.S.C. § 1382c(a)(3)(C). Ms. Walsh, who along with the Commissioner has consented to jurisdiction here, 28 U.S.C. §636(c)(1), asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

## PROCEDURAL HISTORY

Ms. Walsh applied for SSI child's benefits on behalf of A.W. on June 4, 2012, alleging that she was disabled as of that date. (Administrative Record ("R.") 142-150). Her application was denied initially and upon reconsideration. (R. 70-90, 94-101). Ms. Walsh continued pursuit of her claim by filing a timely request for a hearing.

An administrative law judge ("ALJ") convened a hearing on June 24, 2014, at which Ms.

Walsh and her daughter, represented by counsel, appeared and testified. (R. 32-59). On September 19, 2014, the ALJ issued a decision finding that A.W. was not disabled because she did not have an impairment or combination of impairments that met or equaled, medically or functionally, a listed impairment. (R. 12-27). More specifically, the ALJ found that A.W. had a marked limitation in acquiring and using information, a less than a marked limitation in attending and completing tasks, no limitation in interacting with others, no limitation in moving about and manipulating objects, no limitation in caring for herself, and no limitation in health and physical well-being. (R. 20-27). The ALJ's decision then became the final decision of the Commissioner when the Appeals Council denied Ms. Walsh's request for review of on October 19, 2015. (R. 1-6). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Walsh has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.

## THE EVIDENCE OF RECORD

### A.

### Medical and School Reports

Born on July 30, 2000, A.W. was nearly twelve years old at the time her mother filed her application, and fourteen at the time of the ALJ's decision. Her records show that she has struggled in school, despite an Individual Education Program that afforded her numerous accommodations and extra help. Teachers report that she tries hard, but she is still three to four grades behind her peers in Reading and Math. She has some anger issues at school and has been suspended from school

more than once. She was suspended for three days in May 2012. (R. 218).[1] In March 2013, she received a two-day suspension, and she had disrupted a class and then ignored the principal when asked to leave. She also slapped a student and kicked or stomped on a number of other students. (R. 216).

After completing fifth grade in May 2012, A.W. was assessed for her Individual Education Plan ("IEP") for the next school year. (R. 267). She was reading at the third grade level. (R.274). Her math performance was in the "red warning section", below her grade level. (R. 275). She would receive paraprofessional support for 200 minutes each week in Language Arts and Mathematics. (R. 270). She would also receive a number of accommodations in her classes, such as being assigned a peer buddy, being given special instructions, and using a calculator in Math class. (R. 271). For the next school year, she would be graded under modified criteria. (R. 278).

After completing sixth grade, A.W. was assessed for her IEP for the 2013-14 school year. (R. 234). It was noted that she was then three to four years behind her grade level. (R. 227, 239). Her math skills were all in the low range. (R. 237). Writing skills were very weak. (R. 235). At the next grade level, she would receive a number of accommodations, including a peer buddy, and an extension of time to complete work by 20%. (R. 231). In terms of promotion to the next grade, A.W. would be judged by a modified criteria: she would be promoted if she met her IEP goals. (R.. 243).

In May of 2014, at the end of the seventh-grade school year, A.W. had another IEP evaluation. Her teachers commended her efforts and noted that she paid attention and tried in class. (R. 337). But, A.W. was still three to four grade levels behind in Reading, and she scored in the

---

[1] The incident report is essentially illegible. (R. 218).

bottom third in literacy and just the 41st percentile in Math.  (R. 337).  She would, again, need a number of accommodations to get by in the next school year, including extra time for assignments, special instructions and  additional explanation, and the use of computers and tape recorders.  (R. 340).  She would need about four hours a week of special education services in class.  (R. 343).

Among the extra resources A.W. had along the way was the help of a speech pathologist. In August 2012, following A.W.'s fifth grade term,  Sherea Malthis reported that she worked with A.W. at school for 30 minutes a week.  She indicated that A.W. exhibited typical development and was making fair to good progress, but still had myriad problem areas.  She sometimes had trouble getting to the point, staying on topic, conversing with friends and family, taking part in classroom discussions, exchanging ideas clearly, and understanding indirect requests/comments.  She sometimes used poor social communication skills, and added irrelevant information to a conversation.  (R. 190).  A.W. sometimes had trouble understanding frequently used vocabulary words, answering questions about a read-aloud story, following a classroom discussion, following multi-step instructions, understanding ordinal and temporal terms, understanding question words, answering questions correctly, keeping up with the pace, and understanding jokes or sarcasm.  (R. 191).  She sometimes looked around to see what others were doing when gven instructions, asked for directions to be repeated,  and used poor receptive language skills.  (R. 191).  She frequently had trouble understanding terms and concepts presented in oral lessons.  (R. 191).

A.W. had a weak expressive vocabulary, sometimes couldn't find the right words, and frequently used filler words.  (R. 191).  She sometimes repeated what others said with no understanding, and sometimes had trouble forming questions and complex sentences, talking about past events, describing a picture, and explaining a situation.  (R. 191).  She frequently had trouble

telling a story. (R. 191). A.W. also sometimes took a long time to respond to a question, used poor expressive language skills, and sometimes had trouble telling a joke or using humor. (R. 192). The pathologist felt A.W.'s problems sometimes adversely affected her educational performance and her ability to socialize. (R. 192).

Three of A.W.'s seventh-grade teachers provided reports on her difficulties as of March 2014. A.W.'s Science teacher, Mrs. Williams, noted a number of serious problems in the area of acquiring and using information, such as understanding vocabulary, reading and comprehending material, comprehending and doing math problems, and expressing ideas in writing. Mrs. Williams reported that A.W. had great difficulty with comprehension and retaining information. (R. 313). A.W. had problems attending and completing task as well. Obvious and serious problems in various areas – like focusing and completing work on time – arose on a daily basis. (R. 314). Mrs. Williams explained that A.W. was rarely able to complete work on time, even when given extra time, and was often just graded on what she had managed to finish as opposed to the actual assignment. (R. 314). A.W. had fewer problems interacting with others, but did have obvious problems with expressing anger appropriately and expressing herself in everyday conversation. (R. 315). She had no more than slight problems in the area of caring for herself. (R. 317).

A.W.'s seventh-grade Mathematics teacher, Ms. Mosely, also filled out a report. Ms. Mosely related that A.W. had obvious problems in nearly every facet of the area of acquiring and using information. She required extra help from teachers or peers. (R. 321). A.W. fared better in the area of attending and completing tasks, but still had obvious problems with carrying out even single-step instructions and completing assignments at all, let alone completing them accurately. Again, Ms. Mosely said she had to give A.W. extra help in order for her to pass the course. (R. 322). Ms.

Mosely didn't report any other obvious problems in the areas of interacting with others, moving and manipulating objects, or caring for oneself, but she did relate an incident in which A.W. became so angry with another student she punched her locker hard enough that Ms. Mosely thought she may have broken her hand. (R. 325). Ms. Mosely had to take her aside to calm her down. (R. 325).

A final report came from A.W.'s seventh-grade Reading and Social Studies teacher, Ms. LeFlore. In the area of acquiring and using information, Ms. LeFlore reported that A.W. had very serious problems with expressing thoughts in writing and providing organized explanations and descriptions. She had serious problems with understanding vocabulary, reading comprehension, and recalling previously learned material, and at least obvious problems in all other facets. (R. 329). A.W. needed extra help every day in all core subjects, even after instruction and small group practice sessions. (R. 329). In the area of attending and completing tasks, A.W. had serious problems carrying out multi-step instructions, and obvious problems focusing, organizing, completing work accurately, and keeping up with the pace. Ms. LeFlore reiterated that A.W. required a substantial amount of extra help every day. Ms. LeFlore added that A.W. scored well below standards on Reading and Math tests, and had very little knowledge of vocabulary. (R. 330). In the area of interacting with others, there were obvious problems seeking attention and expressing anger appropriately. Ms. LeFlore noted that she had to remind A.W. to clam down and ignore certain distractions. (R. 331). Ms. LeFlore reported no problems in the areas of moving and manipulating objects or caring for oneself. Ms. LeFlore added that, in standardized testing, A.W. was far behind in her performance in Reading and Math. (R. 335).

In September 2012, psychologist Jeffrey Karr, assessed A.W. for the agency, administering a W.I.S.C. IV IQ test. A.W. scored a 67 in both verbal comprehension and perceptual reasoning,

a 71 in working memory, and a 91 in processing speed. Her full scale IQ score was 68. (R. 283). During the test, she was able to persist for the most part, but she required repeated instructions. She had difficulty with conceptualization and non-verbal reasoning. She was able to work in a timely manner. (R. 284). Dr. Karr diagnosed a non-specified learning disorder and borderline intellectual functioning. (R. 285).

A.W.'s mother has also sought treatment for her from mental health professionals. A.W. had an initial psychiatric evaluation on January 12, 2013, at the Human Resources Development Institute. She was restless, unfocused, and exhibited a decreased fund of knowledge. The initial diagnosis was attention deficit hyperactivity disorder and a learning disability. (R. 307). The plan was to begin a prescription for Ritalin. (R. 307). Follow up notes described A.W. as oppositional and defiant on April 13, 2013. She had been suspended from school. Grades were "OK." Her Ritalin dosage was increased. (R. 308). On May 11, 2013, it was noted that she was struggling at school, and having difficulty understanding. (R. 308). The note from June 8. 2013, indicates that A.W.'s mother hadn't filled her prescription because shots had been fired at their house. The prescription was switched to Adderal. (R. 308).

A.W. and her mother saw psychiatrist, Stacyann York, for an evaluation on March 6, 2014. Ms. Walsh explained that they had not been following up with appointments at that time because of the shooting and their subsequent relocation to another neighborhood. (R. 300). A.W. said her medication was helping her but that she still had to focus better to catch up at school. Her mother reported that she was moody and depressed. A.W. overlooked details and had difficulty concentrating. She was easily annoyed and often lost her temper. She argued with authority figures. (R. 300). Dr. York noted A.W. had been treated with Adderal– which had been helpful – Ritalin

– which had not– and Methylin. (R. 301). Her mood was "broad", there was some thought latency, but there were no issues with content of thought. (R. 302). Consciousness was clear, but concentration was decreased. (R. 302). Intelligence, insight, judgment, and reliability were said to be fair. (R. 303). Dr. York diagnosed attention deficit hyperactivity disorder and oppositional defiant disorder. (R. 303).

## B.

### The Administrative Hearing Testimony

At her administrative hearing, A.W. told the ALJ she had just completed seventh grade and would be going to eight grade. Seventh grade was difficult, especially Reading and Math, but she made it through. (R. 37). She said she liked to go on websites that helped her with Reading, like Study Island. (R. 38). Her grades weren't good – she got a few F's – and she explained that every time she tried to do well she fell back. (R. 39-40). She'd be going to a summer school program that summer. (R. 40). AW. got along with her younger sister, but not her two older sisters. (R. 41). She argued with her older sisters. (R. 42). She liked to go outside and have fun with her friends. (R. 42). A.W. admitted that she got into fights at school, and had been suspended for it. (R. 46). She argued with her mother about clothes. A.W. explained that she liked to wear winter clothes in the summer. (R. 43).

Ms. Walsh testified that her biggest concern about A.W. was that she was so far behind her peers academically. (R. 50). She was getting multiple Fs and Ds in her classes. (R. 56). Her grades had been declining in general. (R. 57). She explained that, while A.W. had been taking medication, she wasn't currently because they had moved too far from their doctor. (R. 51). Adderall had helped a little while she was on it. (R. 52). Ms. Walsh thought A.W. was too aggressive with her friends,

and always had to have things her way. (R. 52). She had been suspended twice in seventh grade for fighting. (R. 53). Ms. Walsh said that she had to ask her teachers whether A.W. had homework because A.W. would tell her she didn't. (R. 55).

## III.

## THE ALJ'S DECISION

The ALJ stated that A.W. was a school-aged child at the time she applied for benefits and an adolescent at the time of his decision. (R. 15). The ALJ found that A.W. had the following severe impairments: borderline intellectual functioning, a learning disorder, attention deficit hyperactivity disorder, and oppositional defiant disorder. (R. 15). But, the ALJ concluded that A.W.'s impairments did not meet or equal the requirements of any listed impairment – specifically, listings 112.02, 112.5, and 112.11 – because she did not exhibit pertinent symptoms, such as impaired memory, perceptual disturbances, disturbance in mood, or emotional lability, or a severe impairment of age-appropriate social, personal, or communicative functioning, or marked difficulties in concentration, persistence, or pace. (R. 15-16). Similarly, the ALJ determined that A.W.'s impairments did not functionally equal the listings because she did not have a marked limitation in two areas of functioning or an extreme limitation in one area of functioning. (R. 20-27). Instead, the ALJ found that she had a marked limitation in acquiring and using information (R. 21), a less than a marked limitation in attending and completing tasks (R. 22), no limitation in interacting with others (R. 23), no limitation in moving about and manipulating objects (R.25), no limitation in caring for herself (R. 26), and no limitation in health and physical well-being. (R. 26). The ALJ also found the statements of Ms. Walsh and her daughter were not entirely credible, relying on his summary of the evidence to support that finding. (R. 18). The ALJ gave significant weight to the assessments

of the state agency reviewers, finding they were consistent with the overall record. (R. 20). He gave some weight to each of the evaluations from A.W.'s teachers, because they supported and reinforced his conclusion that A.W.'s most severe limitation was in the area of acquiring and using information, and that her limitations in other areas were no more than minimal. (R. 20). Accordingly, the ALJ determined that A.W. was not disabled and not entitled to benefits under the Act. (R. 27).

## IV.

## DISCUSSION

## A.

### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Berger*, 516 F.3d at 544; *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for

the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott,* 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence is not persuasive. *Berger*, 516 F.3d at 544.

## B.

### Sequential Analysis

A child is disabled under the Act if he has a "physical or mental impairment, which results in marked and severe functional limitations, and . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). Whether a child meets this definition is determined via a multi-step inquiry. 20 C.F.R. § 416.924(a); *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007); *Giles ex rel. Giles v. Astrue,* 483 F.3d 483, 486-87 (7th Cir.2007). At the outset, if the child is engaging in substantial gainful activity, the claim will be denied. *Murphy*, 496 F.3d at 633; *Giles,* 483 F.3d at 486. Next, if she does not have a medically severe impairment or combination of impairments, the claim will be denied. *Murphy*, 496 F.3d at 633; *Giles,* 483 F.3d at 486. Finally, the child's claim will be denied unless the impairment meets, or is

medically or functionally equivalent to, one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Murphy*, 496 F.3d at 633; *Giles,* 483 F.3d at 486-87.

The determination of functional equivalency involves a further analysis of the child's condition in the context of six "domains" or categories, from an age-appropriate standpoint: 1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for oneself, and 6) health and physical well-being. 20 C.F.R. § 416.926a(a), (b)(1); *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 487. A child's impairment is functionally equivalent to the listings, meaning the child qualifies for benefits, if the ALJ finds she has marked difficulty in two domains of functioning or an extreme limitation in one. 20 C.F.R. § 416.926a(a); *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 487.

A marked limitation is one which interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(I); *Giles*, 483 F.3d at 487. It is further defined as "more than moderate, but less than extreme," and can be demonstrated by standardized test "scores that are at least two, but less than three standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(I). An extreme limitation is present where the results of a standardized test are three or more standard deviations below the norm for the test, or when an impairment interferes very seriously with the child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(3).

## C.

The plaintiff's initial issue with the ALJ's decision begins with his finding that A.W. did not meet or medically equal Listing 112.05D or F. Listing 112.05 covers mental retardation "[c]haracterized by significantly subaverage general intellectual functioning, with deficits in adaptive

functioning." 20 CFR Pt. 404, Subpt. P, App. 1, §112.05. The listing is considered met if the requirements of one of sections A through F are satisfied. The ALJ confined his analysis to whether A.W. met Listing 112.05D or E. He allowed that her full scale IQ score of 68 met the initial requirement, but found that she had not demonstrated deficits of adaptive functioning that were sufficiently severe. The ALJ based his conclusion on these facts:

> the claimant's mother reported the claimant does not complete chores, but is well liked by teachers and peers, performs self-care activities, sees friends daily, and has interest in computer games, basketball, and swimming. Dr. Karr observed she was pleasant, cheerful, and polite, with intelligible speech. He diagnosed the claimant with an unspecified learning disorder, and borderline intellectual functioning, adding the claimant exhibited appropriate effort and no behavioral oddities. More broadly, it has been documented that the claimant has friends with whom she spends time, is pleasant, communicates well, participates in group activities, contributes to discussions, plays basketball.

(R. 16). That seems a rather cheerful (and tendentious) gloss on the record confined to a single report from a consulting psychologist that saw A.W. once for about an hour.

Simply put, more elucidation is needed from the ALJ if the conclusion is to be given credence. In his explanation of his finding, the ALJ makes no reference to the several reports from teachers who saw A.W. every school day over the course of a year, and noted multiple serious or obvious problems in multiple areas of functioning. He doesn't mention the report from her speech pathologist. He doesn't consider the IEPs that show that, despite a battery of special accommodations, A.W. lags three grades behind her peers in Reading and Math. He makes no mention of her suspensions from school, one for violently stomping on another student, or the incident in which she punched her locker and had to be taken aside and calmed down. While it is true that the ALJ provided a summary of the evidence in another section of his opinion, we cannot tell why all the negative aspects to be found in that evidence did not play any role in the ALJ's conclusion that A.W. did not meet a listing. That is not to

say that those factors ought to have led the ALJ to a different conclusion, but only to say that the ALJ can't pick and choose among the pieces of evidence, selecting only those snippets that support his decision. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *Myles,* 582 F.3d at 678.

As already indicated, Listing 112.05 can be met in a number of ways. With A.W.'s qualifying IQ score, she can meet the listing by showing "a physical or mental impairment imposing an additional and significant limitation of function," 20 CFR Pt. 404, Subpt. P, App. 1, §112.05D, or that her limited IQ results in either marked impairment in age-appropriate social functioning, personal functioning, or concentration, persistence, or pace, 20 CFR Pt. 404, Subpt. P, App. 1, §112.05E, or that her limited IQ results in marked impairment in age-appropriate cognitive functioning and a physical or mental impairment imposing an additional limitation of functioning. 20 CFR Pt. 404, Subpt. P, App. 1, §112.05F. We don't know what the ALJ thought about these specific requirements because he didn't get into specifics. He stopped short at the preamble to Listing 112.05. (R. 16).

Again, this is not to say that the ALJ's ultimate conclusion that A.W. doesn't meet the listings is wrong; it's saying that the path of his reasoning cannot be traced or reviewed. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). There is no explanation to allow the jump from a 68 IQ and a breezy summary of a single consultative exam report and the more detailed analysis that is clearly demanded by the criteria of the subsections of Listing 112.05. For example, listing requires a marked impairment in age-appropriate cognitive functioning and another impairment resulting in an additional limitation of functioning. Dr. Karr diagnosed A.W. with not only borderline intellectual functioning based on her IQ scores, but a learning disorder as well. A.W.'s treating psychiatrist diagnosed her with attention deficit hyperactivity disorder and oppositional defiant disorder. The ALJ found that A.W. had three severe impairments: borderline intellectual

14

functioning, a learning disorder, and oppositional defiant disorder. So, she has impairments in addition to her IQ. Was the ALJ saying that the additional severe impairments did not result in additional limitation of functioning? The answer cannot be divined from his opinion, and given the record, that's an impossible assumption for the reader to make without some analysis..

As another example, Listing 112.05E is met with a valid IQ score of 60 through 70 that results in one of the deficits set forth in Listing 112.02B2. Among those is marked difficulties in maintaining concentration persistence, or pace. 20 CFR Pt. 404, Subpt. P, App. 1, §112.02B2d. The ALJ found that A.W. did "not appear to exhibit . . . marked difficulties in concentration, persistence, or pace." (R. 15). But the ALJ did note that Dr. York noted diminished concentration in her examination. (R. 19). In addition to that, Dr. Karr reported that, during testing, A.W. had trouble attending to task. Then there are the teachers' reports, which the ALJ reviewed and summarized. Mrs. Williams noted a couple of serious problems and multiple obvious problems in the area of concentration. (R. 314). She reported that A.W. couldn't complete assignments on time even with extra time allowed and couldn't complete them accurately. (R. 314). Ms. LeFlore noted a serious problem following multi-step instructions and obvious problems in focusing, completing work, working at pace, and organization. (R. 330). It's not self-evident all of this results in a finding that A.W. doesn't exhibit marked difficulties in maintaining concentration, persistence, or pace, and the ALJ does not provide any explanation how it could. The ALJ, again, fails to build a logical bridge from this evidence to his conclusion. *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003). An ALJ must not only rest a " denial of benefits on adequate evidence contained in the record" but must also "explain why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008); *Moore v. Colvin*, 743 F.3d 1118, 1124 (7th Cir. 2014)("The error here is the failure to address all of the

evidence and explain the reasoning . . . .").

For similar reasons, the plaintiff takes the ALJ to task for his credibility finding[2]. In his decision, the ALJ summarized the testimony of A.W. and her mother as follows:

> The claimant testified at the hearing that she has difficulties with mathematics and reading, but that she enjoys playing basketball and using computers. She added that she goes shopping with her mother, and warms up food in the microwave. The claimant asserted she had been involved in fights in school.

> The claimant's mother, Barbara Walsh, testified at the hearing that the claimant's attention deficit hyperactivity disorder medications were only mildly helpful, and that she had difficulty getting along with her sisters. Ms. Walsh reported the claimant's grades were getting worse.

(R. 17). The ALJ then said that "the statements" regarding A.W.'s symptoms were "not entirely credible for the reasons explained below." (R. 17). The Seventh Circuit has repeatedly called that "meaningless boilerplate" as it fails to specify which statements are credible and which are not. *Chase v. Astrue*, 458 Fed.App'x 553, 558 (7th Cir. 2012); *Bjornson v. Astrue,* 671 F.3d 640, 645 (7th Cir. 2012); *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010). The boilerplate doesn't necessarily mandate a remand, however, as long as the ALJ follows up with adequate reasoning for why he didn't believe a claimant's allegations regarding their symptoms. *Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir.

---

[2] Social Security Ruling 16-3p, effective March 28, 2016, *see* Social Security Ruling 16-3p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1237954 (Mar. 24, 2016) (correcting effective date of original Ruling), rescinded SSR 96-7p. Social Security Ruling 16-3p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1119029, at *1 (Mar. 16, 2016). The ruling "eliminat[es] the use of the term 'credibility' from ... sub-regulatory policy, as [the] regulations do not use this term" and is intended to "clarify that subjective symptom evaluation is not an examination of the individual's character." Id., n.1. As it is intended to be a clarification of existing law, SSR 16-3p likely applies retroactively, *see Pope v. Shalala*, 998 F.2d 473, 483-84 (7th Cir. 1993), *overruled on other grounds Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999), but, as the ALJ here didn't get into character, the new ruling's focus does not change our analysis. The term "credibility" is used herein only as a convenient shorthand for "evaluation of symptoms" and in view of the fact that it is ubiquitous in Seventh Circuit case law applicable to our review of the ALJ's decision. Of course, on remand, SSR 16-3p will clearly dictate the parameters of the ALJ's decision.

2016); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir.2014). In this case, the explanation is sorely lacking. For his "reasons explained below", the ALJ simply offered a three-page summary of the evidence of record and a series of specific conclusions as to A.W.'s limitations in each of the six functional domains. (R. 17). Despite the ALJ's promise, there was no explanation of how the evidence led to his conclusion.

"[A]lthough we defer to an ALJ's credibility finding that is not patently wrong, an ALJ still must competently explain an adverse-credibility finding with specific reasons 'supported by the record.'" *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015). That means an ALJ must explain his decision in such a way that allows us to determine whether he reached his decision in a rational manner, logically based on his specific findings and the evidence in the record. *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014). "[A] failure to adequately explain his or her credibility finding by discussing specific reasons supported by the record is grounds for reversal." *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015). In other words, an ALJ cannot simply point to his summary of the evidence and say, "here's what supports my credibility finding." That's akin to a document dump in which a party claims an opponent will find the answer to an interrogatory somewhere in a cache of documents but refuses to specify where. *See* Fed.R.Civ.P. 33(d(1).

There may be instances where the evidence so consistently undermines a claimant's allegations of disability that an ALJ need not specify or explain his rationale in any depth. But this is not one of those cases. There is a significant amount of evidence that goes against the ALJ's credibility determination and his ultimate conclusion. The ALJ had to at least explain why he was dismissing it as support for the allegations of A.W. and her mother. *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). An example or two of why the ALJ had to do more here to meet his obligation to build a logical

bridge from the evidence to his conclusion should suffice.

The ALJ seemed to think that A.W. wasn't doing as poorly in school as her mother claimed; at least, that's one of the allegations he specified and said the record undermined. (R. 17). Among the evidence the ALJ mentioned as supporting his credibility determination – again, he essentially said *all* the evidence supported his credibility determination – was A.W.'s May 2012 IEP. The ALJ said that her most recent grades reflected a C average and that she was focused when completing assignments. He said A.W. read at a third grade level, and that she received 550 minutes of special help in her classes over week and 250 minutes of special services in a separate class per week. (R. 17).

One can only guess why the fact that A.W. is reading at a third-grade level when she has completed fifth grade (R. 267, 274) undermines a claim that she's faring very poorly in school. Moreover, while she may be getting Cs in Reading and Math, it is obvious from the lesson plan that she not only receives a great deal of accommodation in class, including a substantial amount of extra help (R. 271-73, 276-77), but that she is graded pursuant to modified criteria as well. (R. 278). The applicable regulation makes factors like "extra help" and a "structured setting" a part of calculus in a child's disability determination. *See* 20 C.F.R. § 416.924a(b)(5)(ii); (iv)(B). If the ALJ was pointing to A.W.'s performance in school as somehow undermining the testimony of her and her mother (R. 21), he was clearly putting too much stock in A.W.'s grades and not taking the reality of the situation into account. He's not allowed to simply ignore such evidence. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Villano v. Astrue,* 556 F.3d 558, 563 (7th Cir.2009). Perhaps the ALJ had something else in mind but, as already noted, he didn't explain his reasoning.

The ALJ's failure to consider the context of A.W.'s "C" performance can be highlighted by looking at his discussion of A.W.'s May 2014 IEP. The ALJ said the report called A.W. a nice,

pleasant girl who is cooperative, asks questions, accepts help when needed, puts forth good effort, takes and refers to notes, and completes all projects and assignments. (R. 19). Her favorite subject was reading, she worked well in groups, and made friends easily. (R. 19). But the ALJ completely ignores the fact that the IEP indicates that, at the conclusion of seventh grade, A.W. was *still* reading at little better than a third-grade level. (R. 337). She had made little progress, if any, over the course of two years of schooling with special accommodations and help. The fact that she tried hard and did what she was supposed to makes her significant limitations all the more obvious; in other words, she wasn't just sloughing off. The ALJ did allow that Math was an area of weakness for A.W. – although, why he didn't note Reading as a weakness is perplexing – and conceded that her Cs were the product of accommodations and modifications but, given his dismissal of A.W.'s and her mother's testimony, he apparently didn't factor that into his credibility determination.

As another example, the ALJ didn't believe that A.W. had much trouble at all completing tasks. In explaining that finding, he reiterated that she put forth a good effort and said she completed all her projects and assignments.. (R. 22). He said there was "no objective documentation that [A.W.] is slow to focus on, or fails to complete, activities of interest, repeatedly becomes side-tracked from activities or frequently interrupts others, is easily frustrated and gives up on tasks, requires significant supervision to remain engaged in an activity, or cannot plan, manage time, or organize herself in order to complete assignments." (R. 22). The ALJ remarked that none of A.W.'s teachers found that she had many serious issues completing tasks. (R. 22).

Actually, Ms. LeFlore reported that A.W. had a serious problem carrying out multi-step instructions, and obvious problems in three other areas. (R. 330). Mrs. Williams said that A.W. had serious problems completing work accurately and on time, and obvious problems in four other areas.

(R. 314). But, more to the point to be made here, both teachers made it clear that A.W. wasn't being held to the same standards or working under the same conditions as the other children. Ms. LeFlore explained that A.W. required a substantial amount of extra help in the classroom on a daily basis. (R. 330). Mrs. Williams qualified her report by saying that A.W required more time in order to complete tasks, and even so, she was unable to complete the assignment accurately or at all. She was often simply graded on the portion she was able to finish. (R. 314). Maybe the ALJ considered this – then again, maybe he didn't – but he had to address it and explain why, given those facts, there was no evidence that A.W. had significant difficulties completing tasks.

In the end, then, the manner in which the ALJ went about articulating his decision is flawed. The ALJ announced conclusions and summarized the record, but did nothing in between. He never provided specific reasons for why his conclusions flowed from the evidence he summarized. This falls short of what is required to allow for meaningful review. *See Giles*, 483 F.3d at 488(remand required where the ALJ mentioned evidence, but did not explain how it supported his conclusion); *Engstrand*, 788 F.3d at 660 (ALJ still must competently explain finding with specific reasons supported by the record). Moreover, the ALJ either ignored evidence that detracted from his conclusions or mentioned it and failed to explain why it didn't affect his end result. His lack of explanation of his reasoning leaves one to guess which is the case. Either way, he missed the mark. An ALJ is not allowed to analyze only the evidence that supports his conclusion and discard, or worse, ignore the rest. *Moore,* 743 F.3d at 1123; *Terry,* 580 F.3d at 477; *Myles v. Astrue,* 582 F.3d 672, 678 (7th Cir.2009). Accordingly this matter has to be remanded to the Commissioner for another look at A.W.'s application for benefits.

**CONCLUSION**

For the foregoing reasons, the plaintiff's motion for remand [Dkt. #13] is GRANTED, and the defendant's motion for an affirmance of the ALJ's decision is DENIED.


**ENTERED:** _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 10/21/16